Case No. 16-1276, et al., Minteq International, Inc., et al., Petitioners v. National Labor Relations Board. Mr. Baskin for the Petitioners. Ms. Weitz for the Respondent. Mr. Kaiser for the Intervenor. Good morning. Maurice Baskin here for Minteq International in this petition for review from a decision of the National Labor Relations Board. Minteq implemented a non-compete and confidentiality agreement pursuant to language in the Management Rights Clause of its collective bargaining agreement with the Operating Engineers Union. What's that language? What's the specific language? which includes intellectual property, and I passed over the fact that the Board itself stated that this agreement constituted work rules. It stated that no less than six times in its decision. So it's work rules, number one. It is regulation of property, intellectual property, number two. And on top of that, it's the actions necessary or advisable to fulfill the mission of the company. Now, this is all plain language in the Management Rights Clause, and this is a contract coverage case. The Board did not analyze it that way. The Board holding, and I quote, was simply that the union did not waive its right to bargain over implementation of the NCCA. They have a footnote saying they reached a successful conclusion. They have a footnote with one sentence. That does not constitute analysis under this Court's previous case. It constitutes a holding, though, right? Well, that's debatable because the person, for two reasons. And our review is de novo anyway, right? Yes, it is de novo, but it's also governed by Metropolitan Life, which says if it's not in the Board decision, then the Board decision is not entitled to. But it's a de novo review of the plain language, right? That's our obligation under the covered by doctrine. Yes, if the Board had made a holding, and so we can take those in steps, the Board's holding appears on page two of the decision. It says, it gives three reasons, and on this point, the only reason given is no clear and unmistakable waiver. They then repeat that holding later, and then they do drop the footnote. And they say that even if the Board were to follow the D.C. Circuit's standard on contract coverage, it would not be sufficient. Not is not, but if they did, it would not. That is dicta. Would it make any difference, whatever they said, our obligations to decide a de novo? Yes. It's unlike everything else where we do many other things where we give deference. Here, we have to just decide what the plain language is. Right, you're not supposed to give deference to the Board, even if they had made a holding. I guess my point to you is- Not even if they made a holding, even if they gave their reasons in this respect, right? Well- They give what is clear, it seems to me, an alternative holding, and now our question is, are they right about the plain language? Why isn't that right? Because under metropolitan life, the integrity of the administration process requires that courts may not accept either appellate counsel's post hoc rationalization or substitute their own for that of the Board. But we have to substitute our own for that of the Board when we review de novo, don't we? Yes, but when the Board makes an analysis, and I guess it's semantics to some extent, and we accept the challenge that de novo review of this you cannot reach- Suppose they had written many pages of analysis on it. We came in and did a de novo review and said, well, you know, you didn't really analyze it correctly. We analyzed it differently, but we come to the same conclusion. Would you then say we have to reverse it? If you came to the same conclusion, no, because you'd be coming to the same conclusion as them under that de novo review. If we do the de novo review and come to the same conclusion as the footnotes, why isn't that exactly the same as what you just said? Because they did not make an analysis. I know they didn't. You think I thought they made an analysis? I went through a long hypothetical about what if they had made an analysis. I'm sorry, I question that. I know they did. And you said if they had gone through the analysis and we had disagreed with the analysis to come to the same conclusion, we couldn't reverse it. Yes. What I'm asking you is why that isn't the same logical exercise if they give a conclusion without their analysis and we reach the same result by analysis? Why wouldn't it be the same result? Why wouldn't it be the same? It would only not be the same if they did not give the analysis. They did not give the analysis in the real case. They did give the analysis in the hypothetical case, but they screwed it up. In either case, we do a de novo and come to the same conclusion. Why shouldn't it be the same result whether it is with inadequate analysis, like the one before us in your review, maybe in all reviews, like the one before us, or instead of inadequate, an incorrect analysis? We do a de novo and come to the same conclusion. It could be the same result. We're saying that there's an extra layer here because of their failure to do the analysis, but we're happy to discuss the de novo review. If one looks at this language, which the board did not analyze, and you look at it de novo, you are left with very clear statements in the contract that plainly authorize this type of rule, policy, whatever you want to call it, that is in the defense of the company's intellectual property. You say it's a work rule. Is that right? Yes. The board said that. We agree on certain aspects of it. Well, you disagreed before, right, in the papers below with respect to the mandatory subject of bargaining. You said it wasn't a work rule, right? It was pled alternatively. Both sides seem to have flipped in different places. I have to confess. I didn't mean just to point that out, but I didn't mean to raise it. All right. So if that's the case, how do we get to this being the plain language? You use the word work rules in the management rights section, but you don't think it's a work rule for subject of mandatory bargaining. So what are we looking at here? Well, we are looking at the board's decision, and the board's decision is based on a finding that it is a work rule, repeatedly. It's a work rule for purposes of mandatory, subject of mandatory bargaining. In your document, you say that this is all to be done by you have a rule of construction, right, plain language, something like that? Yes. And it doesn't say the language of bargaining. It doesn't say the language of law. It just says plain, ordinary use, something like that, right? Is that approximately right? Yes. So if you thought it was not a work rule, then why should a union member whose union signed on to this think it's a work rule? Well, because we're back to the fact that the board has found it to be. of work rule in your provision, right? But we did. I have to push back a little bit. We did argue repeatedly at different points in this case that it was a work rule, that it was regulating property of the company. And for those purposes, it's not a question of whether an employee reasonably interpreted it or not. That applies under the interference language, the Section 8A1 issue. Here, it's not a question of the reasonable interpretation. It's a question of what did the parties bargain about. And the question of whether it's a mandatory subject of bargaining is subsumed in the question of if the parties already bargained about it. It's not a matter of waiver. It's not a matter of whether it's mandatory or permissive. They bargained about it. They reached an answer that allows the company, as in many other companies, to reserve certain rights. And this is one of the broadest management rights clauses you'll find when you compare it with the other decisions, unlike, for example, the Regal case, which is one of the narrowest. Maybe the broadest I've seen in 30 years of following labor law. Yes. Awfully broad. It is. And so when it has this very broad language, this Court has said the parties, by definition, can't think of every conceivable hypothetical grievance. How common are these non-competes in this sense? Non-competes are extremely common. In fact, Googling it in a union setting, in an area, they appear in union contexts. There's not a common thing for the union employees, the CBA employees, to be CBO. Now, CBA employees can be also in a non-compete. Non-competes are much more common at upper management and middle management levels. That is likely true, although there's nothing in the record about it. One can Google and see that there are 30 million employees covered by non-competes out in the world. They don't separate them. What I'm getting is covered by a collective bargaining agreement. Right. They don't. I'm not seeing any statistics specifically about that question. And so you don't have any cases for us to look at to say that a collective bargaining agreement with this broad management rights provision covers? There appear not to be any cases where this has been addressed before, amazingly enough. There were a couple of cases cited by the Board. It's not too amazing if it's the case that there really aren't that many management rights agreements that do this role. If there really aren't that many management rights agreements that cover a bargaining unit employee, then it's really not amazing at all that we don't have cases on it. And perhaps for that reason, this is a case of first impression on that particular point. But in terms of— So it seems to be a new effort by management. We haven't seen management try to do something like this before. Well, but the reason why it happened here is because you have a company that has a very high-tech process compared to the secret formula of Coke by the administrative law judge. They have their own secret formula for this substance that is sprayed onto these furnaces, a very high-technology issue. And they were under a direct threat of the work being given away by their main customer to a competitor, using the technology in the minds and heads of the employees who, unlike other companies, is not just at the senior levels. But the rank-and-file employees were the ones using it. They were given data sheets containing all the secret ingredients. They were given two months of specialized training. So that's why this came to be in a somewhat unusual setting. But it's exactly the kind of thing that a company would need to implement both to protect its business and to set standards and to set work rules and, bottom line, protect its property. Which is a stronger argument, that it's not a subject of mandatory bargaining or that it's covered by the CBA? We think that it's covered by the CBA. It's an overwhelming argument. It's an inclusive argument based on your case law and the plain language of the CBA. I've always believed plain language is the strongest. I think the court has said so, too. The mandatory subject of bargaining raises interesting issues. But, frankly, you do not need to reach them. That's why we let off the brief with it. The government, understandably, waited until very late and then spent eight pages articulating reasons that were nowhere in the board's decision and, therefore, can't be given any credence, just arguments of counsel. And so, looking at it, because I need to reserve a little time for rebuttal, if... Judge Sentelle has a question. Yes. I wasn't sure I did. If Judge Sentelle has a question. You talk about the plain language you had on a decisive case. But isn't the argument, with respect to work rules at least, over what the plain language means? I mean, that's always the argument when you have a plain language argument, I guess. Right. The government's saying it ain't that plain. Is that not correct? Well, it is. I suppose that is an argument, but it's a weak one because what could be stronger than you have work rules in the document? You have the board itself six times saying that this is work rules. So there is no more argument. The board has conceded that position. The board, not the general counsel. The board has conceded it. Speaking of plain language, how does that work in the at-will employment issue? I mean, you start with the plain language here in the collective bargaining agreement. The at-will nature of the relationship lasts for six months, and then it changes to a different relationship. Yes. And, again, actually plain language supports this because the document itself doesn't say that they are at-will. It says this agreement does not affect the employee's status. That's all that it says. It says look somewhere else for what your status is, not to mention the fact that in the first six months and at the time when they signed this, they were. At-will employees. So this agreement does not affect the status. The board reinterpreted the agreement to say that you are now at-will employees. What's your standard there? Aren't we supposed to see what a reasonable employee would think looking at Article 12 and whether she would be confused and anxious about whether she's at-will or not? Isn't that? Exactly. A reasonable employee, not under any conceivable theory, and no employee asked about this. No employee claimed to misunderstand, as the board speculated, whether the collective bargaining agreement even applied. Not only that, an administrative law judge of the United States government found that this could not be reasonably construed by any employee to believe that it had overridden the bargaining. We have to defer to the board, not to an administrative law judge of the United States. But on the question of what is reasonable, the board is supposed to be applying a standard of reasonableness. Doesn't it make sense that if a judge doesn't find it? Lots of cases where different judges have different views about what's reasonable, and that doesn't resolve the matter for the next court. The majority panel of this court says that one of the judges on his own panel is not being reasonable. And that goes to the whole question of the Lutheran Village reasonableness test. Is the board really applying what's reasonable, or are they just taking a conceivable notion that someone could come up with? Can I ask you about the interference with relationships section? Yes. It says, employees shall not directly or indirectly solicit or encourage any present or future customer or supplier to terminate or otherwise alter his relationship with the company. Right? Yes. And the board says, well, section 7 protects asking customers to boycott the respondent's products or services. You agree with that part, right? Yes. Well, if that's the case, doesn't this seem to be a direct interference with the section 7 right to ask for a boycott? Not if you look at the context of the document. I thought you wanted me to look at the plain language. I'm looking at the plain language. So plain language says, solicit or encourage any customer or supplier to alter his relationship with the company. If I ask a supplier to boycott the company or customer, doesn't that constitute a request to alter or terminate? I'm sorry. I don't see the word boycott in there. No, no. That's part of my hypothetical. If I ask a customer to boycott the respondent's, your product or services, which you admitted is protected by section 7, isn't that in violation of something that says I can't encourage a customer to terminate or otherwise alter his relationship with the company? And reading the plain language in the context of the agreement, we just don't separate them. The court doesn't separate them. Assume we don't look at the context for a moment. Then do you agree that this section is in conflict with section 7? No, I won't concede that. Okay. Sorry. No, we don't have to be sorry. I'm just kidding.  What's the reason? Well, because this language cannot be divorced from its context. I didn't ask you that. I will let you get to context. I promise. The language itself, by itself, is there anything in the language that doesn't put it in conflict with the hypothetical that I just gave you about section 7? These words, terminate or otherwise alter relationship with the company, do not on their face address section 7 rights at all. I see. So if I ask an existing customer to boycott the company and no longer deal with the company, you don't think that that, in plain language, is asking them to alter their relationship with the company? I would say not necessarily. No, I don't. I don't read it that way, particularly if I may get to the context. No, no. We'll get to the context. I want to know why you don't read it that way. Well, because a boycott and section 7 rights have very specific meanings that are not necessarily termination or altering of a relationship. These phrases just don't address plainly. It's certainly ambiguous. It's arguable that they do. Would a reasonable employee read this as saying that if he were to ask a customer to boycott the employer, this would be asking him to alter his relationship with the employer? Absolutely not. No reasonable employee could read it that way. Am I allowed to say context again? Yeah, no. These words alone, I can also say that no reasonable employee did, but, okay, I can't say how a reasonable employee would interpret that. Okay. Now give me the context, which part of the context alters. The entire agreement, beginning with the acknowledgment form, beginning with the fact that the employee who testified, who instigated this whole thing, said he understood the agreement, was saying he should not compete. Fine, but no individual employee is what's at issue here. We're talking about the reasonable employee. Okay, what part of the context makes you read this differently then? Sure, look at Section 1. Actually, look at every other phrase of the contract. It's all about not competing and preserving confidentiality. It's about preserving the company's business. It says nothing about their- Are you saying that sentence adds nothing? Excuse me? Are you saying that sentence adds nothing? It adds in the context that they're trying to avoid competition. It doesn't say that, does it? You heard the Chief Judge read the sentence in question, and it has to do with the relationship between the employer and other entities. Right, but this sentence is very common to non-competes. That may well be, but that doesn't answer the question of whether it's in conflict with Section 7. Correct, but if the entire agreement is about not competing, and there's another section that says don't solicit yourself to have hard work come to your company, now this is simply saying don't cause us to lose business to other people that you're not soliciting for. It's just doubling down. For example, a boycott or some similar use of Section 7. It is a conceivable reading of that, but when you look at what the entire agreement is about and what the employees are asked to acknowledge at the beginning, they are asked to acknowledge that the company is in a very competitive business, and it's relying heavily on its trade secrets, and it doesn't want the trade secrets stolen, and it doesn't want them to be given to the competitors. The horse is probably dead by now, sir. I accept that. Thank you. We could reserve a little time for it. You can't reserve it, but we'll give it to you anyway. Good morning. Eric Weiss on behalf of the Labor Board. We divide our time in five minutes. We'll be going to the intervener union. I'd like to begin with addressing what I think are two important mischaracterizations of the Board's decision and order in this case. First of all, the notion that the Board did not make a holding as to the contract coverage issue. That's clearly not the case. The Court looks at Joint Appendix, page 238, footnote 14. I think we've already caught that one. Okay. The Board says in no uncertain terms that in its opinion the contract cannot be fairly read to cover this. The Court is free to think that's incorrect. That's all there is about that, though, right? That's correct.  Your Honor, the Board cites this Court's contract coverage standard, which the Board is very much aware of, and then it provides a very brief analysis saying we've read the contract. We don't think the contract can be fairly read to cover this. Did you ever argue before this Court when Abner Mickle was on the Court? I'm sorry, Your Honor? Did you ever argue before this Court when Abner Mickle was on the Court? I did not, Your Honor. So you never heard him say, look, if you want me to consider something in your opinion, don't put it at the bottom of the page in the footnote. Put it up where my eyes are. Right, well, Your Honor. How do we know whether the Board meant that as a holding or just a footnote? Your Honor, I think it's clearly worded as a holding. The Court is free to think it's very poor analysis and it's insufficient analysis. It's not poor analysis. Well, it's an abbreviated analysis saying the Board said it read the contract. It doesn't think it covers it. The Court is free to dispute that. It's a de novo standard of review. But I'd also point out that although the Board's analysis is very brief, it's actually longer than the contract coverage analysis provided by the employer to the Board. If the Court looks at the exception starting at Joint Appendix page 219, the employer made a waiver argument and then it passively cited two contract coverage cases to say it's also not covered. So the Board provided brief analysis, but it was responding to a very brief argument by the employer. So I think the Board clearly made a holding, and it's now a de novo standard of review for this Court to interpret the contract using its own reasoning. And the second mischaracterization, which I'd like to address, is the notion that the Board said that the non-compete and confidentiality agreement is a work rule. That's clearly not the case. If the Court looks at Joint Appendix page 237 of the Board's decision, they say in part, quoting the Board, the NCCA applies to individuals both while they are employed by the respondent and after their employment with the respondent has ended. As to the former, the NCCA includes rules governing. Going further in the paragraph, in addition, the provisions of the NCCA clearly affect employees' terms and conditions of employment in ways that extend beyond work rules governing employees' conduct in the workplace. So as we argue in our brief, the Board found that the NCCA contains work rules in part as applied to active employees, but the document as a whole, which is the unilateral change at issue here, goes beyond work rules and is not itself a work rule. And therefore, it's not within the contract management rights. Correct. And I'd point out, for example, Your Honor, that many provisions... Well, Your Honor, I'd submit that the Board's reasoning is consistent because it's saying this is a unified document. Many provisions extend to employees after they cease working for MNTEC. For months or even years or indefinitely, they are given legal obligations which require them to do things for MNTEC, and the Board implicitly found that's not a work rule. Those same provisions... Are you saying that the Board's not holding that everything in here is not covered by the management rights clause? Only some things are not covered? Is that what you're saying? Well, the Board analyzed the NCCA as a whole. So it said the document as a whole is not covered by the contract. But as we point out in our brief, that doesn't mean that the employer couldn't unilaterally implement certain portions of the NCCA pursuant to the management rights clause. For example, it could promulgate a rule for active employees, and it might have a legal right to do that under the management rights clause. But what the Board is analyzing here is the document as a whole, which is written... So if any part of the document, not... I appreciate you think it's a big part, but if a part of the document is not a work rule and doesn't come within the management rights clause, the whole document has to go out and they can come back with another document. Is that what you're saying? Correct, Your Honor. And, I mean, it's unclear if having employees sign a contract... This is framed as a contract. It's covered by the management rights clause. But, for example, I think the employer could clearly implement a rule requiring employees not to disclose confidential information and put it in the employee handbook or whatever other means... As a code of conduct, because that's specifically mentioned. Right, standards of conduct. A standard of conduct. Right, some way of promulgating that to employees. And I think the employer would have a very strong argument that it has a contractual right to do so unilaterally under the management rights clause. But what happens here is employees were asked to sign a contractual instrument, which is framed as a contract between the individual employee and the employer, which includes all of these provisions, many of which apply to active employees and could be considered work rules, but many of which extend beyond their employment with MNTEC and place certain affirmative obligations on employees, prevent them from working for competitors. For example, Section 9, if the court looks at that at the NCCA, it's an additional obligation section which says even after an employee has ceased working for the employer, it has to come and assist the employer in any litigation that the employer reasonably thinks that employee could assist with. And if they refuse to do so, the remedy provision in the NCCA says the employer is entitled to go directly to court and seek specific performance or an injunction. It has all of these affirmative obligations that attach to employees even after they cease working. Do you think the word work rule in this management rights clause is equivalent to the meaning of work rule under a mandatory subject of bargaining? No. Well, I think the term work rule as it's used in the management rights clause would be a mandatory subject of bargaining whenever it was exercised. But the board's analysis here was not saying it's a mandatory subject. No, I understand completely your argument. So I'm just trying to see the pieces of it. Right. So you would agree that if it is a work rule for purposes of mandatory subject of bargaining part of the analysis of the board, then it would also be a work rule for part of the management rights second clause. And your argument, I take it here, is some of these things are not work rules nor fit otherwise, and therefore the whole thing goes beyond. Have I got it right? That's correct, Your Honor. I think the board was not labeling particular sections as, quote, unquote, work rule. What it's saying is, you know, a given section, insofar as it applies to active employees, carries an implicit threat of discipline, and thus could be characterized as a work rule. Now, if it were a work rule, would it then be covered by the management rights clause? Absolutely, Your Honor. I mean, the management rights clause says the employer has a right to implement work rules. So the meaning is the same. So if it's a work rule, then it's not. I don't have to bargain, right? That's correct. I don't think the board is relying on some kind of legal distinction or is using the term separately in different sections. What the board is saying is we're considering this document, this contract as a whole, and a given section, even an individual section, which applies in part to active employees and could be considered a work rule, also applies to former employees. And in that sense, it is clearly not a work rule. That may bring me to part of what I think is a fairly simple question that may not have a simple answer. But can you, you know, we don't just write for this case. We have to consider what sort of precedent we're making and what is the delineation of the term work rule that we should create precedent about as to why this is or is not a work rule. Well, Your Honor, I don't think the court needs to make any holding as to the definition of a work rule. I think the only issue here is whether this provision in the Management Rights Clause which says the employer can implement work rules and standards of conduct can be fairly read to cover a requirement that employees sign a contractual instrument that follows them after they cease working for the employer. And I'd argue that the board has presented the only reasonable or limited interpretation of the Management Rights Clause because the employer's interpretation would mean you would have work rules which extend when an employer no longer even works for an employer and the employer is calling that a work rule. And so the board found that the Management Rights Clause does not cover that type of requirement on employees and I think the court can make a holding in agreement with that without having to delineate what a work rule is, that term of art means in different contexts because it's a more easy case here because the NCCA is so expansive You say that a part of an outside agreement, an NCCA or whatever that attaches duties to an employee even after the end of employment is never a work rule? Well, the portion of that that extends past their employment I don't think can be fairly called a work rule. That's not neither good nor bad, it's simply the statement I wanted. It is the absolute position of the board that anything that extends beyond the time of employment is not a work rule. Yeah, within the meaning of this Management Rights Clause in particular which I would point out doesn't just say work rule, it uses the phrase work rule and standards of conduct. Even that's within the meaning of work rule in this agreement. Now, we all know that we also use the term work rule more generically as the thing the Chief Judge was asking you about. So you backed up to say within the meaning of that clause. So is it the board's position that a work rule can never include obligations on an employee beyond employment time or is it the position of the board only that under this clause it cannot extend beyond that? Well, speaking only for myself since the board didn't make that holding here but I would argue that the term, if you read the plain and ordinary meaning of the term work rule, that that would never mean a requirement that applies to employees who no longer even work for the company. I think as we pointed out in our brief, work rule has a particular meaning which is actually consistent with the very lengthy and very detailed Management Rights Clause here which is directing employees in their performance of work, controlling the workplace, that sort of thing. So you did add a sort of a justem generis argument in your brief. So I think that's what the Chief Judge Santel is also asking about which is whether or not it's a—we don't necessarily have to decide that everything that is not a work rule here would not be a work rule under a mandatory subject of bargaining because you're saying in the context the kinds of work rules that we're talking about here are ones that affect existing employees. Is that what you're saying? I think that's correct, Your Honor. I mean, I would continue to argue that the plain meaning of work rule, just an ordinary person reading that phrase, would never consider a requirement applying to former employees as a work rule. But furthermore, what the Court is actually interpreting here is not the generic phrase work rule as a term of art that applies in all cases. It's interpreting this particular contract and what the parties intended when they negotiated that contract. And as Your Honor points out, using traditional cans of interpretation, that term is used in a detailed and lengthy management rights clause to apply to a particular thing. And the employer's argument to the contrary would make that entire clause superfluous because what the employer is asking for is for these phrases to mean that the employer can do anything it wants as long as it's not expressly prohibited by the contract. And that's something that parties negotiate over sometimes, but that's not in this contract. What this contract contains is a very detailed management rights clause, and the Board would just urge the Court to interpret it in context and find that it does not cover this expansive and particular issue. Let me ask you one more question. On the mandatory bargaining question about whether something could be a work rule and affect non-employees, what do you do with the Pittsburgh Plate Glass statement that future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject to bargaining? Well, Your Honor, I guess I would back up a point and say that to determine whether something is a mandatory subject to bargaining, the test is not whether it's a work rule. It's whether it's a term and condition of employment. So what the Supreme Court was saying there and what we argue in our brief is that many of these provisions are terms and conditions of employment. It doesn't turn on whether it's a work rule or not. That's a particular maybe category of a term and condition of employment. But the Board's analysis was not saying this is a mandatory subject because it's a work rule. As I pointed out at the top of the argument, the Board actually held that this document goes beyond work rules and is only a quote-unquote work rule as it applies to active employees because it carries implicit threat of discipline. But what the Board is actually holding is that this document affects terms and conditions of employees in very substantial ways and thus is clearly a Category 2 First National Maintenance term or condition of employment. I mean, this is literally a condition of employment. If these employees wanted to continue to work for Mintec, they had to sign this document, which had all these requirements. So I see that I'm out of time, so I just ask that the Court enforce the Board's order in full. Okay, thank you. Good morning, Your Honors. Charles Kaiser on behalf of Intervenor Local 150, our operating engineers. May it please the Court. To start with, just to address something I heard a little bit earlier, Local 150 doesn't have any collective bargaining agreements that has any non-compete language in it, unaware of any employers who have attempted to have, other than Mintec, have their bargaining employees sign a non-compete agreement. As to whether or not the non-compete agreement is covered by the contract, nothing in the Management Rights Clause and the collective bargaining agreement as a whole contemplates another written unilateral employment contract to be entered into by bargaining employees. If you look at the contract as a whole, especially the Zipper Clause, the only contract negotiated covering the terms and conditions of the bargaining meeting employees is the collective bargaining agreement, not some extra employment contract like Mintec tried to have these employees sign, or actually did have them sign. I'd like to focus on two arguments that support the Board's unanimous decision, and that's the first of which is that the NCCA Do they say something about the Zipper Clause? Maybe the ALJ did, or what? I'll find it if you don't have it on there. Yeah, they're in it in entirety, the Zipper Clause. Yeah, yeah. Okay, go ahead. The first is that the NCCA is a mandatory subject of bargaining. Mandatory subjects of bargaining are those matters that are plainly germane to the working environment that affect bargaining units' terms and conditions of employment and that have an economic impact on the employees. The agreement that Mintec unilaterally implemented here easily meets the test. First, the agreement, as somewhat has been discussed here this morning, it results in lost economic opportunities for the bargaining unit. The agreement prohibits the employees from working for another company while they're employed for Mintec. Such a prohibition impacts the employees because if they were to seek temporary work, there's a slowdown at the mill, as the Board alluded to. If they're on layoff, if an employee was terminated and was awaiting reinstatement perhaps pursuant to agreement and had an obligation to mitigate damages, this language would preclude that employee from looking for work to support themselves. So basically this is a mandatory subject of bargaining unless it's taken out by the Management Tracts Clause. Is that an accurate word, Dan? Your Honor, that would be correct. Again, whether or not the union waived its right to bargain over this particular agreement, I would say that applying this circuit's contract coverage case, when we go back to taking a look at the contract as a whole, certainly when we interpret contracts we're going to look at particular language, but then we're going to look at the document as a whole to make sure that the interpretation that we're arriving at is correct. Again, there's no interpretation of the collective bargaining agreement that could allow for Mintec to unilaterally implement another employment contract with the employees. We've heard it referred to this morning a number of times as a contract. But again, the only entity with authority to enter into any employment contract covering the terms and conditions of the bargaining unit is Local 150, the operating engineers. We are the exclusive bargaining representative. Not only does the NCCA impact economic opportunities for the bargaining unit, it does establish that the employment relationship between Mintec and the employees is one of at-will. It doesn't simply acknowledge that their status doesn't change. It acknowledges that their status as an at-will employee doesn't change, and that directly contradicts what's been bargained into the collective bargaining agreement. They agree that it doesn't change it, so that's not the question, right? The question is only how a reasonable employee would read it. There's no dispute between the parties, I believe, that it does not change the provisions of the CBA regarding the at-will, right? The language of the NCCA says that the employees' status... I appreciate your argument about how it can be read, but I understand the employer's position to agree that it only applies to employees who are at-will during a probationary period. That's the employer's argument. That is correct. Third, Your Honors, the agreement requires that all employees assign their rights to the company for any inventions that they come up with during the course of their employment. Again, this is a matter that impacts their compensation. It certainly makes for it to be a mandatory subject of bargaining. And why is bargaining important here? Why could it be important here? It certainly is important here. Local 150 is the exclusive bargaining representative of these employees. The NCCA impacts their terms and conditions of employment. Mintec, and it's all Local 150 is asking for, bring it to the table. Bargain it. Mintec says they have something important to protect. Perhaps that's correct. But that doesn't relieve them from the opportunity to bargain. You bring it to the table. You have an NCCA. In some ways, it looks like it penalizes employees for doing certain things. Maybe at the table, Mintec says, we don't want the employees to leave. We'd like to keep them here. You can say, incentivize them to stay. Don't enter into these kinds of agreements. Maybe as we're talking about the agreement, Mintec says, I'd really like to have this. It's important to me. So bargaining takes place. Okay, fine. We'll take it to the guys. 18 months. How about 12 months? How about the fact that this thing doesn't apply during the course of their employment? Why don't we take the provision out that people have to go to? You can sue them directly. We've got grievance and arbitration language in our collective bargaining agreement. Was that important to Mintec? They could certainly, under the rules of engagement, bargain it to impasse if that's what they wanted. So I see that my time is up. I appreciate the time this morning. I ask that this Court deny the petition for review. Thank you very much. Thank you. All right. We'll give you two minutes. I'll be brief. In fact, I just want to address a couple of points. The notion that it can't be a work rule because it's in the form of an agreement is belied by other work rules that are signed by the employees in the new hire kit that they get and spend most of the first day signing, including all of the corporate policies. There's Joint Appendix 1301. They signed off on basically the employee corporate handbook containing all of the other policies relating to employment. I also want to come back to the word that I don't believe was uttered in the argument just now, the word property, the ability of the company to regulate and control its property, its other property other than the physical property. This is what this agreement is all about, is controlling its intellectual property in order to defend its business. That may be, but that doesn't answer the question as to whether every part of that agreement is outside the scope of the management rights contract or inside the scope of the management rights contract. And that's my final point I'd like to address, Your Honor, which goes to the mandatory subjects of bargaining. The board seems to take the position that anything that has to do with the conditions of employment is a work rule in there. But then the other items, they're not work rules because they go outside the employment context. They go to when they are former employees. And when that happens, and because the board is taking that position, they're violating the Pittsburgh Play Glass Doctrine because former employees are not covered by such agreements. And there is no duty to bargain as to the relationships between a company and its former employees or its new hires for that matter. And so we're looking at areas that are outside the bargaining relationship and go to the core entrepreneurial beliefs and needs of the company. I'm a little bit confused about that. The part of Pittsburgh Play Glass that I read suggests that if you impose on existing employees obligations or benefits that extend after as a condition of their employment, that is considered a mandatory subject. It's fairly red, this agreement. The parts that it imposes on the existing employees, those are the work rule parts. The parts that it's imposing only are being imposed on former employees. They're not being imposed on the existing employees. Nothing happens to them under this agreement. But it's a condition of their activity now as an existing employee. It's not a question whether it's a work rule. Maybe I'm unclear what your argument is. Are we on the mandatory subject of bargaining issue or are we on the covered by issue? Well, we're trying to address both because the board seems to be trying to have it both ways. They clearly say some parts of it now are work rules, but the other parts, the parts that are the mandatory subjects of bargaining that weren't bargained about in the Management Rights Clause are the things that extend beyond the condition of employment. As I understood him to say, they are conditions of employment and subject to mandatory bargaining, whether they're work rule or not. But they're not conditions of employment. They are by definition events that can only occur after employment. But you have to agree to them while you're an employee. You have agreed to it, actually. You're agreeing to it before you become an employee, but that goes to our new higher argument. We'll pass on that for the moment. And to say that, yes, you agree to it then, but there is no impact, enforcement, remedy, or any other kind until after you have left. How do you deal with the retirement benefits mentioned in Pittsburgh Claim Class? We believe this is analogous to the parts of that case that dealt with retirees. Those imposed only on – it's the sentence that I want to address. To be sure the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject to bargaining. So why is this not the same? And I would be repeating myself, but to say that it's not addressing their – well, certainly not addressing their future benefits. It addresses events that may happen. But it's a limit on their economic prospects in the future. That's part of their deal. You take our wages and you agree to this limit on your future, where you can get your future compensation from. Right. We think fairly read compared to that sentence, compared to this document. It is different. It also addresses a core entrepreneurial concern of a company dealing with its intellectual property, and for that reason as well it's something that a company is entitled to do, that it deals with post-employment situations. My time is up. Thank you very much. Thank you. A very good argument on both sides. We appreciate it, and we'll take the matter under submission.
judges: Garland, Griffith, Sentelle